(C.D. 2997)

GITKIN CO. v. UNITED STATES

United States Customs Court, First Division

(Decided May 8, 1967)

*Barnes, Richardson & Colburn* (*Earl R. Lidstrom* and *Joseph Schwartz* of counsel) for the plaintiff.

*Barefoot Sanders*, Assistant Attorney General (*Glenn E. Harris* and *Brian S. Goldstein*, trial attorneys), for the defendant.

Before OLIVER, WATSON, and RAO, Judges

RAO, Chief Judge: The merchandise involved in these cases, consolidated for trial, is described on the invoices as Philippine mahogany folding doors. The litigation has been limited to the articles designated on the invoices by the identifying numbers 2484, 250, and 150–P, and to the sizes 30 by 80 inches, 32 by 80 inches, 36 by 80 inches, and 48 by 80 inches. The merchandise was assessed with duty at 16⅔ per centum ad valorem under paragraph 412 of the Tariff Act of 1930, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T.D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 138, T.D. 52476, as manufactures of which wood is the component material of chief value. It is claimed that the merchandise is properly dutiable at 15 per centum ad valorem under said paragraph, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, as doors.

The pertinent provisions of the tariff act, as modified, are as follows:

[Par. 412, as modified by T.D. 52373 and T.D. 52476.] Manufactures of wood or bark, or of which wood or bark is the component material of chief value, not specially provided for:

\*　　\*　　\*　　\*　　\*　　\*　　\*

Other (except \* \* \*) _____ 16⅔% ad val.

[Par. 412, as modified by T.D. 54108.] Manufactures of wood or bark, or of which wood or bark is the component material of chief value, not specially provided for:

\*　　\*　　\*　　\*　　\*　　\*　　\*

[B]

Doors _____ 15% ad val.

This case is a retrial of the issues involved in *Gitkin Co.* v. *United States*, 54 Cust. Ct. 182, C.D. 2530, appeal dismissed December 13, 1965, the record of which was incorporated herein. In that case, Ralph

Gitkin, treasurer of the plaintiff company, testified that he was familiar with the articles described on the invoices as "folding doors" since he had designed them and did the purchasing and placing of the orders. An illustration of such a door and a photograph of part of one were received in evidence. The articles appeared to consist of narrow vertical slats held together by threads or tapes, suspended from a track attached to the ceiling or doorway. Mr. Gitkin said that the finished product was produced in Japan and the package, as imported, contained the folding door, the track, and the hardware for installing it. He stated that the articles were made to fit a 3-foot opening and were the standard height of doors. They were bought and sold as Philippine mahogany or lauan folding doors. He had seen them used in hotels, private homes, and department stores throughout the country to close openings. The most common use was to close closets, but they could be used between rooms, as room dividers, or to close off one area from another.

A number of invoices of the Jencraft Manufacturing Co., the selling affiliate of the Gitkin Co., and a group of newspaper advertisements were received in evidence. They described the articles as mahogany folding doors, but some of them showed the product suspended from the ceiling and used as a room divider. In one instance, the articles were advertised as "excellent for closets, open doorways (use a pair for extra wide openings), and for room dividers."

A witness called by the defendant testified that he had seen similar products used as closet or wardrobe closures, room dividers, for the concealment of utilities in recreational areas in schools, to separate divisions in cafeterias, and as window shades and cottage curtains. These uses were not all of the same sized articles as those involved herein. According to the witness, the dimensions of items in sizes 80 inches by 32 or 36 inches were those of articles used for door purposes, and he called them folding doors.

The court sustained the collector's classification of the merchandise under the provision for manufactures of wood rather than that for doors, on the ground that no samples of the merchandise were produced; that, from the illustrations, the articles appeared to have some of the characteristics of ordinary wooden doors and some of the characteristics of curtains or draperies, and that much of the evidence reflected plaintiff's own usage of the term "door."

In the instant case, plaintiff has produced samples illustrative of the imported merchandise. Plaintiff's exhibit 1, representing style 2484, and plaintiff's exhibit 2, representing style 150–P, were attached to a framework simulating a doorway in order to demonstrate how the articles appear when in use. Exhibit 3, also representing style 2484, consists of the package in its condition as imported, containing the

slatted portion, the track, the hardware necessary for installation, and an instruction sheet.

The principal portion of each imported article is made of narrow vertical slats woven together. Those in exhibit 2 are narrower and are joined only by means of interweaving with cord or string. The slats in exhibits 1 and 3 are in addition woven together with tapes of lighter color than the slats, giving the material a checkered effect. The material is also more solid than that of exhibit 2, where one can see between the slats. The imported merchandise includes also a track to attach to the top of a doorway plus the hardware needed for installation. The length of the track corresponds to the width of the particular article imported. Fastened to the top of the woven material at intervals are plastic or metal pieces to which are attached hooks with heads which fit into the track. The hooks are connected by a chain. By this means, the article is suspended from the track. At one side of the woven material is a solid bar of plastic to be attached to the frame of the doorway and at the other a wider bar which has a handle to pull the article along the track. Exhibits 1 and 3 have magnetic catches to hold the closure in place. When attached, as shown by exhibits 1 and 2, the material hangs in folds and closes the opening. When open, the slat material is pushed back into tight folds. There is no track for the bottom of the doorway and the lower portion of the article hangs loose.

Ralph Gitkin was again called as a witness. He stated that he was familiar with the merchandise involved herein and identified the samples, described above. He added that style 150–P (exhibit 2) was a cheaper interpretation of style 250, but the physical characteristics of the two were identical. He explained that to install the articles he would attach one end of the track to the frame of the doorway, slide the article into the track, attach the other two screws affixing the track to the frame, attach the blunt end of the woven material to one end of the frame so it is permanently anchored, and attach the handle. Then, he said, the article would work freely in the track.

Mr. Gitkin was read the following definition of a door:

The moveable frame or barrier of boards or other material usually turning on hinges or pivots, or sliding, by which an entranceway into a house or apartment is closed and opened. Also, a similar part of a piece of furniture, as in a cabinet or bookcase.

The witness stated that, in his opinion, the imported article fell within that definition because it was a moveable barrier of wood or other material and was used in an opening for a door. He explained that there were standard sizes of doors in the United States and that they had a standard height of 80 inches; that the majority of single door openings were from 30 to 36 inches wide, and that double doorways had widths of 48 inches.

Mr. Gitkin was then read a definition of a folding door:

A door that can be folded; also one of two or more doors of full length together filling a single opening; also, less properly, a pair of sliding doors between two rooms en suite.

In the witness' view, the articles before the court fell within that definition.

Mr. Gitkin stated that in the previous case he had testified that articles such as exhibits 1 and 2 could be used between rooms, as room dividers. He explained that the article by itself could not be used as a room divider, but that by the use of a series of them an entire opening could be closed. He said, however, that exhibits 1 and 2 did not contain, when imported, any means for attaching one to another, and that in order to do this, the consumer would have to improvise. The merchandise was not sold for such an installation. He stated that one track could be placed end to end with another track and would function as a track if butted against each other tightly so that anything traveling on the track would not jam. He pointed out that in order to use an article like exhibit 3 as a room divider, it would have to be suspended from the ceiling, and that if the ceiling were more than 80 inches high, there would be a great deal of space at the bottom. Since the average ceiling height is much greater than 80 inches, one would first have to drop a ceiling or a partition. He explained that exhibit 1 in the previous case was an artist's drawing and that one cannot tell from it whether the merchandise is suspended from the ceiling or from nowhere. He said that the descriptive material mentioning a height of 6 feet 8 inches had reference to a door opening.

In addition to the definitions of the term "door" quoted in the previous case, the court's research has disclosed the following:

door. A hinged or sliding frame used for closing or opening an entrance or exit, as to a house. [Britannica World Language Dictionary, 1963.]

screen door. A door consisting of a frame filled with netting to exclude insects. [Webster's New International Dictionary, 1953.]

revolving door. A weather door consisting of two or more flaps revolving together on a common vertical axis within a kind of cylindrical vestibule, the flaps being so constructed or arranged as to prevent the direct passage of air through the vestibule. [Webster's New International Dictionary, 1953.]

folding doors, a pair of doors with hinged leaves that unfold from either side of a wide doorway and meet in the middle to close it. [Webster's New World Dictionary, college edition, 1964.]

Door, a wooden or metal, sometimes stone frame or panel constructed to open and shut on hinges; used for entrances to buildings, rooms, etc. Sometimes made of one piece, but generally of several sections framed together. * * * In modern carpentry, doors are classified under two general heads: batten-doors and panel-doors. The former

are made of two or more boards placed longitudinally and held together by traverse rails. The latter are formed of a skeleton frame work into which is fitted lengths of thin board called panels. Folding and sliding doors have been improvements upon the hinge variety, working on tracks or grooves and having the particular value of saving space. [The Encyclopedia Americana, vol. 9, p. 262; 1953.]

Modern times have brought many improvements to doors and in their fittings and manipulation. There are circular (revolving) doors which rotate as the pedestrian passes through them, doors which are planes of clear plate glass, and doors which open automatically as one passes through a beam of light. [Collier's Encyclopedia, vol. 6, p. 546; 1952.]

It is evident from these definitions and articles that there are many types of doors and that there have been changes and improvements over the years. Tariff statutes are made for the future as well as the present and bring within their provisions all subsequently created articles which properly fall within them. *United States* v. *L. A. Salomon & Bro.*, 22 CCPA 490, T.D. 47483; *Davies Turner & Co.* v. *United States*, 45 CCPA 39, C.A.D. 669.

The provision for doors in paragraph 412, as modified, *supra*, is an *eo nomine* one, and since it is unlimited, it includes all forms of the article. *United States* v. *Williams Clarke Co., etc.*, 50 CCPA 67, C.A.D. 822. A folding door or a sliding door is by definition a form of a door. The instant merchandise consists of woven slatted articles which slide on tracks and are folded back to open a passageway or entrance and are drawn out to close it. Size, shape, construction, and use have been held significant factors in determining the identity of articles for tariff purposes. *United States* v. *Quon Quon Company*, 46 CCPA 70, C.A.D. 699. The articles here are in the dimensions of standard doors. They differ in construction in that they do not consist of a rigid frame or barrier of boards, but are made of slatted and woven material and hang in folds. However, each has a solid bar on one side, which is attached to the frame of the doorway to hold the door in place, and another rigid bar on the other side to which is attached a handle to pull the door along the track. When closed, the article fills the opening.

Defendant claims that plaintiff has not shown that these articles are chiefly used as doors, citing *United Enterprises et al.* v. *United States*, 41 Cust. Ct. 73, C.D. 2023, appeal dismissed 46 CCPA 151, and *Frazer & Hansen et al.* v. *United States*, 47 Cust. Ct. 40, C.D. 2277. Both these cases involved panels or frames in various sizes, which, after importation were used in the manufacture of sliding doors, window blinds, screens, room dividers, and other articles. Here the merchandise consists of complete articles, ready for installation. They more closely resemble the merchandise involved in *Franklin B. Howland, Charles D. Walker Co., et al.* v. *United States*, 53 CCPA 62, C.A.D. 878, which consisted of stock size, interior wooden shutters under 80 inches in height, only requiring hinges and other hardware

to install them as window blinds. The testimony given by manufacturers, sellers, distributors, and installers was held to support the conclusion that wooden shutters such as those in issue were chiefly used in interior window openings, as window blinds, to control air, ventilation, and privacy. The court noted that the articles could be used for different purposes, but found that the chief use was as window blinds.

In the instant case, the weight of the evidence establishes that the chief uses of the articles in the sizes here involved are door uses: To close an entranceway into a room or closet. There is no evidence that they could be used satisfactorily in any other way. They could not be used as dividers of ordinary rooms or without improvising a way to attach several of them together. There is no evidence that they were actually so used. A fugitive use or a mere susceptibility of use is not controlling. *United States* v. *The Baltimore & Ohio R.R. Co. a/c United China & Glass Co.*, 47 CCPA 1, C.A.D. 719.

We hold, therefore, that the merchandise involved herein is properly dutiable at 15 per centum ad valorem under paragraph 412 of the Tariff Act of 1930, as modified, *supra*, as doors. The protests are sustained and judgment will be entered for the plaintiff.