(C.D. 3020)

B. A. McKenzie & Co., Inc. *v.* United States

United States Customs Court, First Division

(Decided May 29, 1967)

*Glad & Tuttle* (*George R. Tuttle* of counsel) for the plaintiff.
*Carl Eardley*, Acting Assistant Attorney General (*Morris Braverman* and *Brian S. Goldstein*, trial attorneys), for the defendant.

Before OLIVER, WATSON, and RAO, Judges

RAO, Chief Judge: The merchandise involved in these cases, consolidated at the trial, is described on the invoices as louver doors or as bifold door units, in various sizes. Plaintiff's brief limits the claim to single panels or two panels hinged together, in the following sizes:

Height: 78⅝ inches
Widths: 8¾, 11¾, 13¾, 14¾, 15 ¾, 17¾, and 23¾ inches
Thickness: 1⅛ inches

The merchandise covered by protests 64/23411 and 65/16271 consists of two panels, hinged together and having certain hardware thereon. It appears that any claims as to wooden shoji doors in various sizes on the entry covered by protest 65/3456, and the panels in size 14¾ by 94⅝ inches on the entry covered by protest 65/13129, have been abandoned.

The merchandise was imported from Japan during 1963 and 1964. It was assessed with duty at 16⅔ per centum ad valorem as manufactures or articles of wood, not specially provided for, and is claimed to be properly dutiable at 15 per centum ad valorem as doors. The assessment and the claim are under the Tariff Act of 1930, as modified, as to merchandise entered prior to August 31, 1963, and under the Tariff Schedules of the United States as to merchandise entered thereafter.

The pertinent provisions of the statutes are as follows:

Paragraph 412, Tariff Act of 1930, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and

Trade, 84 Treas. Dec. 403, T.D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 138, T.D. 52476: ·

Manufactures of wood or bark, or of which wood or
  bark is the component material of chief value, not
  specially provided for:

  *    . *      * ·     *     *     *     *

    Other (except * * *) _____ 16⅔% ad val.

Paragraph 412, Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108:

Manufactures of wood or bark, or of which wood or
  bark is the component material of chief value, not
  specially provided for:

  *     *     *     *     *     *     *

    Doors _____ 15% ad val.

Tariff Schedules of the United States:

206.30    Wood doors with or without their hard-
           ware _____ 15% ad val.

  ·  · *  ·'   *,     *.     *     *     *     *

207.00  ·  Articles not specially provided for, of
           wood _____ 16⅔% ad val.

The following witnesses testified at the trial on behalf of the plaintiff: James C. Picha, president of Allied Building Components, the importer herein; Donald MacDonald, manager and vice president of Seattle Door Company; Robert Rose, assistant sales manager of Palmer G. Lewis Company; Valen K. Kramer, vice president in charge of sales of Allied Building Components; and Charles D. Walker, importer, manufacturer, and seller of louver doors and shutters. Defendant called Jack F. Howland, whose business, J. F. Howland Associates, relates to home furnishings and home decorating.

The official papers, samples illustrative of the imported merchandise, and catalogs and brochures were received in evidence.

Exhibit 6 consists of a full louvered panel, 11¾ inches wide and 78⅝ inches high, and exhibit 7 consists of a panel louvered in part and in part with a raised panel, 11¾ inches wide and 78⅝ inches high. Exhibit 1 consists of two panels 78⅝ inches high and 11¾ inches wide, hinged together and having certain hardware thereon. Mr. Picha testified that the hardware was described on a sheet attached to the invoice, as 2–B hardware. It is listed there as—

        1 pair upper pivot assemblies
        1 pair guide wheel assemblies
        1 pair lower pivot pin

Mr. Picha stated that panels without hardware are imported in exact width and height for bifold door use and that hinges and hardware

are added after importation. Such panels and those imported with the hardware already attached are sold with an extra carton containing a track and lower housing and a set of instructions for mounting. The witness said he had planned or designed the hardware for use with the track and described it as follows:

The guide wheels have a dowel fit process, which means that they do not have to have a wood screw to hold them in. Therefore, in use they don't work loose. The lower housing has a patented adjustment feature. Therefore, when the door goes in the opening, it can be adjusted to the outer square opening. The track is of a vinyl material, and has an adhesive feature on it. * * *

It appears from the brochures and instruction sheets (exhibits 4, 5, 8, 9, 10, and 11) that the track is attached to the top of an opening, and the lower housing is positioned on the floor directly under the track. The pivot on the top of the outside edge of one pair of panels is inserted into the upper pivot housing. The pivot on the bottom of the panel fits into the lower housing. The pair of panels is then slid onto the track. Two hinged panels forming a single unit or two sets of hinged pairs may be used to close an opening. The top appears to fit closely to the track, and the bottom is flush with the sill. To open, one panel is folded against another. The panels are taut when closed. Knobs may be placed on the panels to assist in opening and closing.

Mr. Picha testified that the panels with the hardware, as in exhibit 1, are designed to be used only with importer's track and mountings. He stated that the standard widths of doors are 2 feet 6 inches, 2 feet 8 inches, 3, 4, 5, and 6 feet, and that the standard heights or opening sizes are 6 feet 8½ inches and 8 feet. He explained that the doors sold by his firm have to be made a quarter inch undersize in width and an inch and three-eighths undersize in height in order to work. At one time, his firm made doors 78¾ inches high because the original hardware took a little less in height room.

According to the witness, the sole business of the importer is the selling of bifold wooden doors all over the United States, including Hawaii and Alaska. The units are sold to independent wholesalers, such as Palmer G. Lewis, lumber yards, large builders, and national chains, such as United States Plywood, and Ward's. His firm has also ordered and purchased door panels in exact heights and widths from a domestic manufacturer, Seattle Door Company, and has added the hardware in the same way as to the imported panels. Mr. Picha estimated that his firm had imported 150,000 units in the past 5 years.

The witness was read the following definition of a folding door from Webster's New International Dictionary, 1953 edition (quoted in *Gitkin Co.* v. *United States*, 54 Cust. Ct. 182, C.D. 2530):

A door that can be folded; also, one of two or more doors of full length filling a single opening; * * *.

The witness stated that he agreed with the definition and that it described the unit he sells after it is hinged together. He was also read the following definition of a door from the same dictionary:

The movable frame or barrier of boards, or other material, usually turning on hinges or pivots or sliding, by which an entranceway into a house or apartment, is closed and opened; also, a similar part of a piece of furniture, as in a cabinet or bookcase.

The witness said that that definition described the item as imported, as shown by exhibit 1, after it is installed. He knew of no other use for units in these specific widths and heights. His firm handles no other doors, except for an item designated in the catalog, exhibit 5, as "swingin' doors," which the witness said are called "cafe" or "cafe doors" in the trade. Since they do not fit a complete opening, the witness said they would not be considered a door under the definition quoted.

Mr. Picha testified that he had never seen items like exhibits 6 and 7 used as screens in those sizes. He had seen screens 12 inches wide. He had never seen shutters 8¾ inches wide. Shutters ordinarily are in widths of 12, 14, 16, or 18 inches and are 3 feet 6 inches in height. He had never seen exhibits 6 and 7 used as room dividers because they are the wrong heights. In the trade, he said, a room divider is something that goes all the way to the ceiling and divides a room wall to wall. Even in the 96-inch height, these panels are not capable of use as room dividers because they would have to have other hardware with a different spacing. He explanied:

* * * Normally, a room divider is termed as multiple doors that roll one way. Generally with that, you have to have a special load-bearing hardware in order for this to carry and therefore your size, on your height, is designed to fit for specifically the spacing that we use.

Other hardware could be put on but his firm has not done so except in a rare case.

Mr. MacDonald testified that his firm, Seattle Door Company, manufactures and sells flush doors, louver doors, folding louver doors, and units of the type involved herein. They are sold to wholesalers, distributors, and manufacturers' agents throughout the United States. A catalog illustrating such merchandise was received in evidence as plaintiff's exhibit 8. The witness said his firm sold panels (without hardware), in different woods than the imported panels, to Allied Building Components, the importer. It sold to others panels with the hardware attached but with a track manufactured by Acme Appliance Manufacturing Company, which is similar to but not the same as that manufactured by Allied Building Components. His firm sold 10,000 units a month to Allied and 1,500 units a month to others.

The witness said he agreed with the definitions quoted and stated that they identified the louver doors or panels sold by his firm to Allied. He had seen such items used as screens but did not think they were in the same size. He had not seen such articles used as shutters.

Mr. Rose testified that Palmer G. Lewis Company purchased products like exhibit 1, completely packaged with the hardware and instruction sheets, such as exhibits 2 and 3, from Allied Building Components and sold them to retail building materials firms and millwork houses in Alaska, Washington, Idaho, and Montana. He agreed with the definitions of a door quoted above and considered they described the product which his company sold as doors.

Mr. Kramer testified that he had supervised the preparation of the brochure, exhibit 5, and had handled sales of the products described therein in the major metropolitan markets of the United States. In the Seattle market he had worked with salesmen of the Palmer G. Lewis Company, in Kansas City with salesmen for the United States Plywood Corporation, and also in Boston. He trained and instructed salesmen and also worked with their customers. He had prepared the advertising brochure of the United States Plywood Corporation, which is the same as exhibit 5, except for the name of the company and the product. He had seen it distributed by the United States Plywood Corporation.

He had never seen nor heard of any use for the item represented by exhibits 1, 2, and 3 other than as a folding door. He said that one of the uses is between rooms, as a room separator; that there was a specific product known as a room divider, having multiple folds, but that exhibits 6 and 7 could be used only as bifolds; that panels to be made into room dividers would be of a different size. With the importer's hardware, no more than two panels are hinged together. They are sold as fours or two pairs. With other hardware possibly four panels could be put together, but they would have to be cut to a different size. He said that articles such as plaintiff's exhibits 1, 6, and 7 are known as bifold doors. The so-called "swingin' door" does not fit the definition of a door which was read at the trial, but, according to the witness, it is known as a door in the industry.

Mr. Kramer had prepared ad mats which are sent to distributors all over the country. A glossy reproduction of one was received in evidence as exhibit 11. The first page depicts a closet with two pairs of hinged panels in the epening. Underneath is listed:

| | |
|---|---|
| Wardrobe | Guest closet |
| Room separator | Washer/Dryer |
| Hall divider | Wall to wall |
| Coat closet | Furnace |
| Linen closet | Air conditioner |
| Broom closet | Water heater |

The witness testified that a room separator is a door that separates one room from another, and that other uses enumerated, such as wardrobes, between rooms, hallways, and broom closets, referred to uses as doors to close off or separate openings. The term room divider is used to refer to a multiple number of doors hinged together, hanging from and rolling on a track. There may be eight doors which may be folded to one side. Bifold doors are used to fill a smaller opening, 6 feet being the widest practical width.

Mr. Howland testified that he was familiar with panels, such as exhibits 6 and 7, and had used them in his business for 20 years. In his opinion, they have been used in homes for two or three hundred years. He had used them as room dividers, as standing folding screens, for closet enclosures, and as shutters. He had used panels of this nature of about 8¾ inches in width, within a quarter of an inch one way or the other. He had just finished a job where eight panels about 11¾ inches wide and 8 feet high were used as a room divider to divide a large living room. In his view, the average floor standing screen would have four panels. He had seen panels of this nature used in a folding door arrangement and said that they were multipurpose.

In rebuttal, Mr. Walker testified that he manufactured, imported, and sold at retail and wholesale louvered doors and shutters; that he employed a crew of 38 people, and sold at wholesale to 800 or 900 lumber yards. He said he imported two different types of doors. One is a standard stock size in widths of 12, 14, 15, 16, 18, and 24 inches and 80 inches high. The other type is for bifold products, meaning four panels to a unit, packaged ready for installation. They are imported in widths of 11¾, 13¾, 14¾, 15¾, and 17¾ inches and about 78⅝ inches in height to allow for the track. After importation, the latter-sized panels are made into units such as exhibit 1. They are sold to builders, contractors, and lumber yards, and used for clothes closets mostly. He had never seen doors in the latter sizes used for any purpose other than in a bifold unit. He had used stock sizes in bifold units, but they had to be trimmed down.

Plaintiff has set forth its position in its brief as follows:

Plaintiff contends that these custom size doors with or without hardware mounted, in their imported condition, fall within the common meaning of the word "door" or "folding door" as set forth in *Gitkin Co.* v. *United States*, C.D. 2530; that the doors have been physically manufactured to a specific end use as bi-fold doors by being cut to size; that they are ready for installation only requiring the addition of track and hardware after importation and that the doors are chiefly used as bi-fold doors. Plaintiff therefore contends that their physical features of size dedicate these panels for use as folding doors, and distinguish them from so called stock-size panels in widths of 12″, 14″, 16″, 18″, and 24″ by 80″ high, which possess a number of uses.

Defendant claims that plaintiff has not established that these panels are chiefly used as "doors"; that, in their condition as imported, they are capable of many uses, such as screens, dividers, and coverings of air conditioners, washers, dryers, furnaces, and water heaters; that, in advertising these articles for use in "special areas," plaintiff indicates that they have uses other than as doors. Defendant contends further that these articles do not fall within the definition of and are not commonly known as "doors."

The first question then is whether these panels, as imported, are mere material which can be and are used for a number of purposes or whether they are dedicated solely for making into the articles sold by the importer as bifold or folding doors. The difference is well illustrated by the cases of *United Enterprises et al.* v. *United States,* 41 Cust. Ct. 73, C.D. 2023, appeal dismissed 46 CCPA 151; *Frazer & Hansen et al.* v. *United States,* 47 Cust. Ct. 40, C.D. 2277; and *Franklin B. Howland, Charles D. Walker Co. et al.* v. *United States,* 53 CCPA 62, C.A.D. 878.

The *United Enterprises* case involved shoji panels described by the court as rectangular wooden frames with a wooden grille, fretwork, or grating filling the inside of the frame. Some were backed with white, translucent paper, and some were not. They were in various sizes, from 36 by 18½ inches to 8 feet by 68½ inches. They had been classified by the collector as screens, and it was claimed that they had not been advanced to a point where their use as screens had been made clear. The evidence established that they were used as partitions and room dividers; were fastened to walls for decorative purposes; used to cover wall openings or unsightly places; mounted on tracks to serve as sliding doors or as sliding shutters when mounted before windows, and as folding or "free-standing" screens. The court concluded that the panels as imported were not dedicated to the making of any particular articles or class of articles, but were materials with which many different articles might be made. It stated:

Thus, they may be used to make doors or walls, which are, in our opinion, not screens, or they may be used to make partitions, dividers, light diffusers, or floor screens, which we consider to be screens. In their imported form, the articles at bar are adaptable to all of these uses— some, because of their size, being more readily adaptable to particular uses than others—but they are all essentially materials with the use of which many articles, including screens, may be made.

In the *Frazer & Hansen* case the merchandise was denominated by the witnesses as "shutters" and was described by the court as wooden frames about three-fourths of an inch thick, varying from 6 inches wide by 20 inches long to 16 inches wide by 80 inches long. In the center of each frame were wooden louvers or slats, which, in some cases, were movable and in others were not. The evidence established that they were used in many ways; that they were cut to size and

joined together to fit the place where they were to be used and, in most cases, hardware, such as hinges, tracks, or knobs had to be attached. They were generally used to cover or close off an opening in a house to secure ventilation or light control or for a decorative effect. They were used in window and skylight openings, room or closet doorways, in furniture door openings, as room dividers or partitions, and as purely decorative treatment of window or doorway openings. The court sustained plaintiffs' claim that the articles were not window blinds but were materials from which window coverings or doors or partitions for rooms or furniture might be made and that, in their imported condition, they were not dedicated to any of these uses or to any class of uses which would characterize them as blinds.

The *Franklin B. Howland* case was limited to stock size, interior window shutters under 80 inches in length with movable louvers. The testimony given by manufacturers, sellers, distributors, and installers was held to support the conclusion that wooden shutters such as those in issue were chiefly used in interior window openings, as window blinds, to control air, ventilation, and privacy. The court noted that the articles could be used for different purposes, but found that the chief use was as window blinds.

The panels presently before the court, while belonging to a large class having various uses, such as the material involved in the *Frazer & Hansen* case, are in specific sizes designed for use only with the importer's hardware and track, or similar hardware and track. There is no evidence that these sized panels were or could be used satisfactorily in any other way. Since door openings are generally in standard sizes, these panels could not be used to make ordinary doors attached to jambs by hinges, because they would not fully close the opening. Conversely, material in standard sizes would have to be cut down in order to make the product sold by the importer. It may be that the imported panels could be used to make free-standing screens, but there is no evidence that they actually were so used. Mr. Howland's testimony is not related specifically to these sizes but to the class of material in general. Also because of size, these panels could not be used as room dividers. We conclude that these panels, with hardware and track, are dedicated to use and sold as bifold and singlefold doors or folding doors.

Are such articles, "doors," as that term is commonly understood?

In *Gitkin Co.* v. *United States, supra*, this court held that the record there presented was not sufficient to establish that articles described on the invoices as Philippine mahogany folding doors, consisting of narrow vertical slats held together with tape, which, when in use hang from and slide along a track, were properly classifiable as doors under paragraph 412, *supra*.

The issues in that case have since been retried and additional evidence and samples presented. *Gitkin Co.* v. *United States*, 58 Cust. Ct. 383, C.D. 2997 (protest 63/15009, decided May 8, 1967). In our decision, we noted that there are many types of doors; that there have been changes and improvements over the years; that tariff statutes are made for the future; and that the provision for doors in paragraph 412, *supra*, is an *eo nomine* one, covering all forms of the article, including folding and sliding doors. On the basis of the expanded record, we held that the involved merchandise, which consisted of complete articles in standard door sizes, ready for installation, and which were chiefly used to close entranceways into rooms or closets, were classifiable as doors under said paragraph 412.

The court in the first *Gitkin* case quoted the definitions of doors used at the trial in this case. In addition, we note the following:

door  A hinged or sliding frame used for closing or opening an entrance or exit as to a house. [Britannica World Language Dictionary, 1963.]

folding doors, a pair of doors with hinged leaves that unfold from either side of a wide doorway and meet in the middle to close it. [Webster's New World Dictionary, college edition, 1964.]

Door, a wooden or metal, sometimes stone frame or panel constructed to open and shut on hinges; used for entrances to buildings, rooms, etc. Sometimes made of one piece, but generally of several sections framed together. * * * In modern carpentry, doors are classified under two general heads: batten-doors and panel-doors. The former are made of two or more boards placed longitudinally and held together by transverse rails. The latter are formed of a skeleton frame work into which is fitted lengths of thin board called panels. Folding and sliding doors have been improvements upon the hinge variety, working on tracks or grooves and having the particular value of saving space. * * * [The Encyclopedia Americana, vol. 9, p. 262, 1953.]

The panels here are rigid frames with louvers. When hinged together, the leaves unfold from either side when a pair of units is used and from one side when one unit is used. The article is attached by pivots; it is taut when closed and completely fills the opening. It thus falls within the definition of the term "door."

Defendant claims that the use of these articles is not confined to door uses. Most of the uses mentioned by plaintiff's witnesses and listed in the brochures are clearly door uses: To close an entranceway into a room or a closet. Mr. Kramer testified that the uses referred to in exhibit 5 were as doors to close off openings or separate openings. Mr. Walker said that units of the type here involved are used mostly for clothes closets. These witnesses, who bought and sold the products in substantial quantities, testified that they had not seen nor heard of uses for the articles except as doors. The brochures refer to

other possible or suggested uses, some of which are unclear. The term "hall divider" is used, but the picture in exhibit 11 is of a small closet. The term "room separator," as has been shown, does not mean "room divider." "Wall to wall," "utility wall," and "special uses" appear to refer to closing off recesses in walls, not room dividing. The only possible uses which resemble those of screens rather than doors are those for the purpose of concealing appliances, such as washers, dryers, furnaces, air conditioners, and water heaters. The record does not establish that the merchandise was actually used for those purposes, but indicates rather that these uses were suggested in hope of selling more of the product. In view of the entire record, including the samples, we conclude that the merchandise is chiefly used as doors.

The imported articles are in a similar condition to the merchandise involved in the *Howland* case, as to which the court of appeals stated:

\* \* \* We, however, agree with the Customs Court that the articles at the time of importation:

> \* \* \* had been subjected to every manufacturing process necessary for their completion as window blinds and their chief use as such. None of the work, upon which plaintiffs base their argument, is a manufacturing process. Trimming, planing, or minor cutting \* \* \* to fit them properly in window openings, are corrective details, forming a perfect window blind. Fitting hinges and other items of hardware, only equip the shutters for their chief use as window blinds. Supplying such equipment is not a manufacturing process. Nor is painting or staining \* \* \* for preservation, and to impart an attractive appearance, a manufacturing operation. \* \* \*

\* \* \* \* \* \* \*

In addition to the above, we may well take judicial notice of the fact that window blinds require some means of attachment to the freehold by application of means, such as hinges, to complete installation and insure utility in their intended environment. Such in nowise changes their character or impedes their purpose to control air, light and privacy.

We hold that the wooden panels involved herein, 78⅝ inches high and 8¾ to 23¾ inches wide, with or without hardware, are properly dutiable at 15 per centum ad valorem as doors under paragraph 412 of the Tariff Act of 1930, as modified, or item 206.30 of the Tariff Schedules of the United States, depending on the date of entry of the particular shipment. To that extent the protests are sustained. As to all other merchandise, they are overruled. Judgment will be entered accordingly.